Good morning. My name is David Lowery, a pre and under captain of Mr. Wack. I think there are two things worth talking about in this case. One is the failure of the ALJ to recontact, excuse me, treating sources when he allegedly didn't agree with or understand their opinions. There are Social Security rulings on this saying that the ALJ or the adjudicator has a duty to make every reasonable effort to recontact doctors when they don't understand the basis for their opinions. It seems obvious to me, perhaps less obvious to others, that when the ALJ wants to deny a claim, contacting the doctor to further explain the opinion would basically be counterproductive because that's exactly what the doctor would do. He'd explain how he came to that conclusion, which would not help the ALJ deny the case. So why do it? Why not just deny the case and let OGC worry about how to defend the decision later? A similar but related issue arises with- What would you have be clarified? Whatever the ALJ claims they don't understand. In this case? Well, in this case, there was an opinion that the claimant, Mr. Wack, could only stand or walk for ten minutes at a time, which the ALJ rejected. The basis for that seems to be that the claimant testified that there have been occasions when he's walked up to two miles to visit his brother, and the doctor said only ten minutes. So in that case, the ALJ looked to the subjective assessment, self-assessment of Mr. Wack and said, I'm going to override the doctor's estimate of ten minutes. Yeah, that was very convenient because there was also evidence that Mr. Wack fell down. There was one occasion where he fell down three times trying to cross a street. He'd been advised at a hospital that when he falls down, he should stay down for about five minutes to recover before he gets up and tries to walk again. All of that was ignored. That was likely the reason for the doctor's suggestion that he only walked for ten minutes at a time in order to avoid those kind of problems. But if you don't write to the doctor and say, why did you say ten minutes, you'll never get an explanation of why the doctor said that. Another issue that we encounter in almost every single case is failure to, in a methodological sense, establish a mental RFC where mental impairments are alleged, or a physical RFC where physical impairments are alleged, in accordance with the methodology that's set forth in various social security rulings of the commissioner. And we get case after case where, particularly with mental RFC, there's no pretense even of complying with the social security rulings of the commissioner. But even in physical RFC cases, that methodology is not followed, and it's all kind of done ad hoc. And what we desperately need... Counsel, I appreciate your giving us the background. It would be helpful if you tie it, in this case, to your general complaint, I understand. What specifically are you focusing on here? Give us a concrete example of how that played out here. Sure. In this case, this man has tremors or shakes. They're not 24 hours a day. They're not every minute of every waking hour. They're something that come and go. If you're going to make a finding that the person can lift and carry 20 pounds occasionally and 10 pounds frequently, when this person has the history of these tremors, they drop things, the claimant's mother testified that she banished him from the kitchen because he dropped so many things in the kitchen, that finding of fact doesn't... Finding the fact that he can lift and carry 20 pounds occasionally and 10 pounds frequently is just kind of arrived at arbitrarily. And the methodology of the Social Security rulings is kind of honored in the breach. What methodology did the doctors who opined ignore? It's not anything that doctors ignored. It's what the ALJ ignored that's the problem. What we need is... Wasn't there substantial evidence that the man could carry 20 and 10 pounds based on the doctor's assessment? Well, he might be able to do that at some times, but those times would be unpredictable. Well, you're not saying that he has to find that he can carry 20 and 10 pounds 24 hours a day. No. Or even 8 hours a day at all times. Well, throughout an 8-hour working day. He's got to be ready to carry 20 pounds occasionally and 10 pounds frequently. Yes, but to make that finding... But to make that finding, the ALJ has to ignore the evidence from the treating sources as well as from the claimant and his witnesses, that he has these shakes and he drops things a lot. So the finding ignores most of the evidence, basically. And we need a published decision from this court that basically tells the district court when the Social Security rulings that say do it this way have not even been attempted to be complied with, don't just kind of rationalize this away. Hold the government's feet to the fire and reverse the case. Well, what I think was the point of Judge Fisher's comment, I'm more interested in Mr. Wack's particular case than in what our system of law needs in general here. So what I really need to know from my point of view is why the ALJ, why you think the ALJ could not make a negative credibility determination concerning Mr. Wack. Well, you'd have to make it concerning virtually everybody. Well, let's just talk about Mr. Wack. Well, it wasn't just... Did he make a negative determination about Wack? I thought that he disbelieved some degree of the impairment that Wack testified to. Am I wrong? Well, I don't know whether you're wrong or right. I don't know quite how to address that. Well, didn't the ALJ say he did not fully believe Mr. Wack? He may have. I thought he made an express negative and adverse credibility determination. And then we have legal standards for when such a determination can be made. In order to make any kind of finding like that about Mr. Wack, you have to ignore all the other evidence to the same effect, all the other witnesses who testified to the same effect, as well as the input from the doctors to the same effect. The first question, though, did he or did he not make a specific negative or adverse credibility determination? Are you saying you don't know? Well, I'd have to go back and look at the decision to read what was actually said. Okay. Do you want to save time or do you want to respond? Yeah, I think I'll sit down and save time. Okay. Good morning, Your Honors. May it please the Court. David Bloom for the Commissioner. Okay. Somewhere in the course of your argument, it doesn't have to be right at the outset, but I want to know if there was a negative, you know, an adverse credibility determination, and if so, was it consistent with our precedent or not consistent with it? Yes, there was, Your Honor. Starting at pages 22 of the record and going on through at least page 23, the LJA specifically found plaintiff's credibility lacking, and he gave several acceptable reasons under this Court's precedent for doing so. First of all, he cited the objective medical evidence that contradicted plaintiff's subjective claims of disability. He noted that the examining physician, Dr. Carvalho, examined plaintiff in June 1997 and found minimal, if any, limitations. And furthermore, thereafter, plaintiff's condition improved, and even his treating neurologist, Dr. Mertens, indicated on more than one occasion that his myoclonus, his tremors, were well controlled on medication. The LJA gave other reasons to reject his credibility as well. He noted that plaintiff's testimony regarding his drug and alcohol abuse was inconsistent, and as this Court has held in Thomas and Verdusco, that's an acceptable reason to discount plaintiff's credibility. He noted plaintiff's drug selling activity, which is kind of significant. We have about a five-year period here at issue from February 1997 through June 2002, and in two of those years, plaintiff actually was working. He just happened to be doing so illegally selling drugs. Well, what did that involve? I mean, he was selling drugs, and that sort of carried a negative connotation throughout this record, but what does it have to do with his ability to work lawfully? I mean, he's selling drugs. If he's sitting in a chair in his living room and people drop by and he hands them a packet of meth or crack or whatever it was, and I'm not endorsing it in the slightest, but how does that prove anything other than he had some illicit gainful employment? Well, the ALJ noted that it connotes at least some ability to engage in work-like activities. Well, but what – I mean, I don't think I'm being – I'm not being facetious, but you can sell drugs in a very passive state, so the question I have is what is evidence? Is there a physical amount of characteristics of that illicit work that he's done? There aren't any, which is why the ALJ did not find plaintiff not disabled at step one. He simply noted it, and it goes to a plaintiff's motivation to some degree. I mean, what motivation does he have to go seek work when he's sitting at home earning money illegally? Probably to find lawful employment so that he doesn't have to sell drugs. Well, it was one factor among many. In that same vein, where he did apply his negative, having found him not credible, what he then did, what the ALJ did do, having found him not credible, he then used his subjective testimony of being able to – with a cane for two miles. So when the ALJ decided that he wanted some reason to overturn the finding and recommendation of the treating physician, he then took Mr. Wack's statements as credible, and indeed so credible as to override the medical opinion of his treating physician. How does that square? Well, ALJs should be allowed to take certain statements against a claimant's own interest and factor it into their credibility analysis. And I don't know that he really fully rejected the medical opinion from Dr. Mertens that we're talking about. Well, he didn't fully, no. He accepted it, but in the critical elements of being able to move and how much he could live, which are two items of criticality to the RFC, is he just said, well, I take the claimant's estimates over the considered opinion of this treating physician, whose all other opinions I am willing to accept. Well, I'm unaware of any case law that says where an ALJ finds a plaintiff not entirely credible. He then has to discard everything the plaintiff says. Well, I'm not suggesting he should discard it, but I'm curious as to why, when it works to his disadvantage, the ALJ takes him to be credible. And counsel has raised a question that perhaps you could address then is, in that tension between the two, why wouldn't the ALJ then seek clarification rather than simply resolve it that way, since it's a fairly critical aspect of whether Mr. White can perform any useful work? Why wouldn't he have gone back to Dr. White and said, well, how is it that you think materially differently from your patient? I don't know why he didn't. The ALJ has discretion to decide whether or not he recontacts any physician for more information. Regarding the plaintiff's ability to move around, I think it's important to note that the ALJ did limit him to a sit and stand at will option, which is highly restrictive. And even with that, the vocational expert testified that the plaintiff would still be able to perform his past relevant work as a gate guard. Regarding the lifting issue that you mentioned, being able to lift 20 pounds, the ALJ simply credited the plaintiff's statement that he could, and he looked at the medical evidence as a whole, not simply that one opinion from Dr. Mertens. My impression was that the vocational expert was given a set of limitations that the ALJ attributed to the claimant, and with those limitations, the vocational expert said he could still hold down work in the economy essentially as a guard or something like that. Is that correct? Correct. And the only, I guess the issue relates to the ALJ did not state limitations to the full extent of the testimony of Mr. Wack himself. Well, he doesn't have to. Or a few of his doctors. He doesn't have to accept all the limitations stated by either Mr. Wack or his doctors. The ALJ's job, as you know, is to weigh all the evidence and balance it and choose those limitations that he feels are supported by substantial evidence. Here he found that the plaintiff was able to lift 20 pounds and was able to walk two miles. Although I should say that the walking element may not be so relevant to the job here. This job was a gate guard, and it doesn't make much sense that you would be walking away from the very gate that you're supposed to be guarding. The ALJ did limit him, as I said, to a sit-stand at-will option, and that's a critical limitation, but the vocational expert testified that there were a sufficient number of jobs generally performed that way in the national economy, so the plaintiff could perform a gate guard job. Gate guard doesn't require, as our CSOs do, in this building, for example, they walk the perimeter as well as guarding the doors. Is that clear in the record that the sit-stand gate guard was simply a stationary, one-location type of position? The testimony, the evidence seems to support the ALJ's finding. The vocational expert testified that there were a range of gate guard positions, and he found that the job, as plaintiff actually performed it in the past, he could no longer do, but the VE noted the possibility that a gate guard could even be sitting in a lobby. So there are a range, and the plaintiff couldn't perform all of them, but he could perform enough to do the job as it's generally performed. All right. I don't think we have any questions, if you have nothing further. The only thing I would say, Your Honor, is that there is substantial evidence in this record to support the ALJ's decision. Dr. Carvalho's examination of the plaintiff alone serves as substantial evidence under this Court's precedent in Tonopetian, and a fair reading of the record supports the ALJ's interpretation that, although the plaintiff was in a bad state shortly after his drug-induced coma in February 1997, he did recover over time with treatment and with medication, and was able to perform the gate guard job as generally performed with a sit-stand at will option. Thank you. I guess there would be three points to make. While the claimant got better after the coma, it would be overstating the point to say he recovered. He simply got a little better. The witness testimony and the claimant's testimony was all to the effect that these problems still continued to persist. Second thing, opposing counsels said that ALJs have discretion whether to recontact doctors, and that's simply not true. On page 18 of our brief, we quote SSR 96-5P as saying, the adjudicator must make every reasonable effort to recontact the source for clarification of the reasons for a disability opinion. And that's been the law for, gosh, forever. Third thing, the ALJ and opposing counsel both relied on Dr. Carvalho's examination where she thought he was doing pretty good. And that's just an illustration of the problem of good days and bad days and the fact that he's not doing bad every minute of every day. There are times when he does better. It's just one of the considerations here is the ability to sustain employment over time, and the fact that you have good days and bad days and you go to exam when you're having a good day doesn't bear a whole lot of light on whether you have the sustainability needed. And that needed to be taken into consideration. It was not. Thank you. Pardon me, counsel. Now that you've had your recollection refreshed by the opening remarks of counsel from Social Security, as to whether there was a negative credibility finding. In the decision, he simply says he finds the claimant was not entirely credible. What reasons are there in the record for us to derogate that negative credibility finding? When you make a credibility finding, you're supposed to say what testimony was not credible and why. Because the claimant may have testified on 20 or 30 subjects, and a negative credibility finding on one subject doesn't amount to a negative credibility finding on every subject. And the judge should be going through this point by point and saying, I don't believe this particular testimony for this particular reason or reasons. Generalized findings have never been permitted. And that's the problem in this case and lots of other cases, too. Thank you. We thank counsel for their arguments. The case is argued as submitted.
judges: Fisher, Gould, Bea